IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF SAMUEL A.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF SAMUEL A., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

BRYAN A., APPELLANT.

Filed June 23, 2026.    No. A-25-738.

Appeal from the Separate Juvenile Court of Douglas County: CANDICE J. NOVAK, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Brady J. Hoekstra for appellant.

Alexis Homme, Deputy Douglas County Attorney, and Abbey Quille, Senior Certified Law Student, for appellee.

RIEDMANN, Chief Judge, and BISHOP and FREEMAN, Judges.

BISHOP, Judge.

INTRODUCTION

Bryan A. appeals the order of the separate juvenile court of Sarpy County terminating his parental rights to his son, Samuel A. We affirm.

BACKGROUND

PROCEDURAL BACKGROUND

Bryan is the biological father of Samuel, born in March 2015. Suzanne R. is the child's mother. The State sought to terminate Suzanne's parental rights to Samuel during these same juvenile proceedings below, but she ultimately relinquished her parental rights. Because Suzanne is not part of this appeal, she will only be discussed as necessary.

- 1 -

On February 3, 2023, the State filed a supplemental petition alleging that Samuel was a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) because he lacked proper parental care by reason of the fault or habits of Bryan, in that:

        A. Byran . . . is currently incarcerated.

        B. Bryan . . . has engaged in domestic violence with Suzanne R[.] placing said juvenile at risk for harm.

        C. Bryan['s] . . . use and/or possession of controlled substances and/or alcohol places said juvenile at risk for harm.

        D. Bryan . . . has failed to provide said juvenile with proper parental care, support, supervision, and/or protection.

        E. Due to the above allegations, said juvenile is at risk for harm.

The State also filed a motion for the immediate temporary custody of Samuel to be placed with the Nebraska Department of Health and Human Services (DHHS), with placement to exclude the home of Bryan. The juvenile court entered an order that same day. Samuel has since remained in DHHS' custody and in a relative foster home placement.

On April 6, 2023, Samuel was adjudicated to be a child within the meaning of § 43-247(3)(a) based on Bryan's "no contest" plea to the allegations in paragraphs "A" and "E" above; the remaining allegations were dismissed on the State's oral motion. The matter proceeded to immediate disposition, and the juvenile court ordered Bryan to participate in agency-supervised visitation; submit to random frequent drug testing; undergo a co-occurring evaluation; participate in family support services; obtain and maintain safe and stable housing; obtain and maintain a legal source of income; and participate in family therapy when recommended. Following a continued disposition hearing on May 31, Bryan was also ordered to participate in outpatient mental health therapy to include a "DBT group" as recommended in the co-occurring evaluation.

Following subsequent review and permanency planning hearings, the juvenile court also ordered Bryan not to facilitate any contact between Samuel and Samuel's mother; if Bryan brought Samuel's mother to any visits or facilitated contact between her and Samuel, Bryan's visitation would be suspended until further order of the court. Bryan was also ordered to participate in individual therapy as recommended, participate in medication management, and complete an updated chemical dependency evaluation.

The State filed a motion to terminate Bryan's parental rights to Samuel in June 2024, but it withdrew that motion in November.

On February 14, 2025, the State filed the operative motion to terminate Bryan's parental rights to Samuel pursuant to Neb. Rev. Stat. § 43-292(2), (6), and (7) (Reissue 2016). The State alleged that Bryan had substantially and continuously or repeatedly neglected and refused to give the child, or a sibling of the child, necessary parental care and protection; reasonable efforts to preserve and reunify the family failed to correct the conditions leading to the adjudication of the child under § 43-247(3)(a); the child had been in an out-of-home placement for 15 or more months of the most recent 22 months; and termination of Bryan's parental rights was in the child's best interests.

The parental rights termination hearing was held on May 19, 2025. The State called several witnesses to testify, and exhibits were received into evidence. Bryan testified in his own behalf.

Michelle Rosenberg, a DHHS child and family service specialist, was assigned to Samuel's case in February 2023 and was the ongoing case manager at the time of the termination hearing. It was Rosenberg's understanding that Samuel came into DHHS' custody after law enforcement responded to a call related to a domestic violence incident at a hotel room where Samuel was staying with family members, and illegal substances were present in the hotel room. Samuel had been in a relative foster placement since his removal in February 2023. (During his testimony, Bryan said he was incarcerated at the time of Samuel's removal for "[d]omestic violence . . . which I didn't do"; Bryan also denied that he was using drugs at the time.)

Evidence was presented about Bryan's progress on his court-ordered requirements to participate in a co-occurring evaluation, mental health treatment and a "DBT group," updated mental health and chemical dependency evaluations, random drug testing, family support services, fully supervised visits, and family therapy. Evidence was also presented about his progress on his requirements to obtain and maintain a safe and stable house and a legal source of income.

According to Rosenberg, Bryan participated in a co-occurring evaluation in August 2023, and it recommended that he participate in outpatient mental health treatment and a "DBT group." The provider that completed the co-occurring evaluation was going to provide the recommended treatment, but Bryan failed to attend the scheduled appointments. Bryan found a different provider in February 2024.

Taylar Mason testified that she was a provisionally licensed mental health therapist. She provided therapy services to Bryan from February to November 2024, and they had 21 sessions during that time. Bryan was diagnosed with an adjustment disorder with mixed emotions, depression and anxiety. Their therapy goals focused on anxiety, depression, relapse prevention, and independent living. Mason's treatment plan was cognitive behavioral therapy (CBT) and dialectical behavioral therapy (DBT). She stated that CBT "focuses on how our thoughts, feelings, and behaviors affect how we feel and behave and think and challenging potentially irrational thought or challenging negative behaviors that are causing potential negative thoughts." DBT "focuses on distress tolerance, emotional regulation, interpersonal relationships and mindfulness."

Mason and Bryan had sessions weekly or bi-weekly, depending on their schedules. Mason stated that from what Bryan shared, he worked hard to find housing but was frustrated because of the lack of response from landlords and property management or the housing would fall through. When asked if Bryan discussed any barriers to obtaining housing, Mason responded that Bryan and his mother had "evictions on their records." As for barriers to employment, he had a "physical disability, like, his ankle was a part of that process or a problem." However, in the fall of 2024, Bryan informed her that he had obtained employment.

Mason testified that Bryan attended therapy consistently until "around August, September of 2024" but then he became less consistent. Around that time, Bryan admitted that he had relapsed. According to Mason, "relapse is part of recovery," and it was good that he shared the relapse with her; "it would have been concerning if he hadn't shared." Mason last saw Bryan in late November, and he was ultimately discharged from services in January 2025 because there had

been a lot of "no shows" and a lack of communication. Mason was asked if she considered it a successful or unsuccessful discharge and replied that it was "partially successful." "[W]hen we were meeting, things seemed to be going well," and he was making progress, but "I don't know where he's been from November [2024] to now." Bryan's therapy goals were ongoing, and there was still a need to address the goals that had been established.

Case manager Rosenberg testified that three different drug testing agencies had been assigned to Bryan from March 2023 through January 2025, but he was unsuccessfully discharged by all three agencies, and was discharged from one of them twice. (According to exhibits received into evidence, between March 15 and the end of November 2023, Bryan tested negative for substances a handful of times but missed numerous drug tests. And between August and September, he tested positive eight times for some or all of the following: methamphetamine, amphetamine, "MDMA," and alcohol.) According to Rosenberg, Bryan had been consistent and compliant with all UAs from early August through November 2024 and did not test positive during that time. However, he tested positive for methamphetamine in December. Additionally, it was Rosenberg's understanding that Bryan was arrested on three separate occasions in January and February 2025, and each arrest involved possession of controlled substances.

Rosenberg also testified that three different agencies were assigned to provide family support services to Bryan from March 2023 through January 2025, but he was unsuccessfully discharged by all three agencies due to a lack of participation.

Tanya Ezui testified that she was Bryan's family support worker from July 2024 until January 2025. They worked on his court-ordered requirements to secure housing and find employment. According to Ezui, Bryan did not qualify for housing through the Douglas County Housing Authority, so they had to look at other options. Bryan wanted to live with his mother, so both names needed to be included in housing applications. Ezui helped Bryan find an apartment "that would be low income" and helped him with the application, but the application was denied; Bryan was not employed at the time, and his mother's income was not sufficient. Ezui then gave Bryan contact information for a private landlord; Bryan looked at a rental but did not apply "because of his mom" as the unit was on the second floor. He contacted another private landlord, but his application was denied; he told Ezui that it was because of his rental history. Bryan looked at other housing options too but never obtained housing while Ezui was providing family support services. Bryan was able to find a job, but Ezui could not recall when that occurred. She did not see a pay stub, but Bryan came to her office "with his job jacket on" and one time she saw him "driving the company car."

Ezui stated that, in the beginning, Bryan was on time and fully engaged in their meetings. She was seeing improvement until Bryan was arrested and then he was not as consistent. He would be late, and there were more cancellations or "no show[s]." After Ezui started seeing inconsistencies, she reached out to Bryan's caseworker, and the caseworker said to continue services. Ezui explained that to discharge a client, she sends a 14-day notice to DHHS, and after they receive it, the caseworker will ask her to continue services or allow a discharge. After the caseworker asked her to continue services, Ezui met with Bryan one time. Then "he was nowhere to respond to us," so Ezui reached out to the caseworker again. This time, the caseworker said that Bryan had been incarcerated a second time and to discharge him. Bryan was discharged from family support services on January 28, 2025.

Rosenberg testified that during the life of this case, up until November 2024, Bryan was not employed but reported that he was attending community college. In November he reported that he obtained employment, but Rosenberg had not received any paystubs or other confirmation that he was employed. (According to Bryan's testimony, he believed his employment requirement was fulfilled when he was enrolled in school, and at that same time he was "filing for disability because of [his] leg." He said he had "impact trauma arthritis" and nerve damage on his ankle. At the time of the termination hearing, he had not yet received disability but said there was "a hearing coming up.")

Rosenberg also testified that during the life of the case, Bryan reported that he was either staying with friends or staying in hotels. In November 2024, he told Rosenberg that he and his mother were moving into a home, but Rosenberg was not given the address or any proof that he had appropriate housing. (During his testimony, Bryan stated that in January 2025 he was "renting a basement in a house," that he had been doing so for "over a year," and Rosenberg knew where he lived. However, he was "basically kicked . . . out" when he was arrested.)

Dominic Lombardo, an officer with the Omaha Police Department, testified that on January 6, 2025, he responded to a call to help a company locate a vehicle that had been used by Bryan. The company wanted to terminate Bryan's employment and had attempted to contact him multiple times, but he failed to respond and kept the vehicle. The vehicle was located in the area of Abbott Drive and Gallup Drive. Officer Lombardo stated that other employees of the company were able to provide credentials showing the company had a claim on the vehicle. Officers were able to locate Bryan in the area, and a female named "Susanne" was with him. Because the vehicle was found in a "high narcotics area," Officer Lombardo asked the owners of the vehicle for permission to search the vehicle and remove any property that belonged to Bryan. Officer Lombardo was concerned that if the employees left in the vehicle and were pulled over for a traffic stop, they could be charged if there were narcotics in the vehicle. After obtaining permission, Officer Lombardo conducted a search and found several pieces of drug paraphernalia with drug residue, several baggies with white powder residue, a "small amount of field-tested positive methamphetamine," and "venue belonging to [Bryan]." Bryan was placed under arrest for possession of a controlled substance.

A certified copy of a transcript from Douglas County District Court shows that on January 8, 2025, Bryan was charged with two counts of possession of a controlled substance, each a Class IV felony. The substance identified in count 1 was methamphetamine, and the substance identified in count 2 was cocaine. The events in both counts were alleged to have occurred on or about January 6. Bryan subsequently pled "no contest" to count 1, and the State dismissed count 2. Sentencing was set for May 12.

Rosenberg testified that after Bryan's first arrest in January 2025, she spoke with him about completing an updated co-occurring evaluation, which he agreed to do. The provider attempted to get him to schedule the evaluation, but it did not occur. However, it was Rosenberg's understanding that Bryan had to do an updated substance abuse evaluation to get into the Miracles Program at Sienna Francis House, and it was completed at the end of February; it recommended residential inpatient treatment. Rosenberg said that Bryan entered the Miracles Program in April, and she received verbal reports from his case manager there that he had been drug testing negative for substances. To Rosenberg's knowledge, Bryan never participated in a DBT group.

Bryan testified that he had been residing at the "Miracles program, Sienna Francis house," since March 24, 2025. He described the Miracles Program as "a 12-step program that basically uses the 12-steps of alcohol [sic] anonymous," and it has other classes "like mindfulness, relapse prevention, CBT, CAT, criminal addictive thinking, and self-worth." There was also individual and group therapy. He was currently on the 7th step of the 12-step program and said "you do a step a week." "Once you get to the 10th step we're allowed to go to work . . . and then we start working on the housing and getting everything in order for a transition." Bryan had "[a]bout a month and a half to two months" left in the Miracles Program before he could find housing. Bryan said the program made him realize he had a problem and needed help, and he was "definitely" benefiting from the inpatient treatment. When asked how he came to join the Miracles Program, Bryan replied, "I applied and asked to go there," "[t]he Court helped me get in there" and "I had to get a treatment bond to go." In his criminal case, he pled to "possession of controlled substance" and received 3 years' probation.

Rosenberg testified that Bryan was only allowed agency-supervised visitation with Samuel during this case. The location of the visits had to remain in a neutral location due to Bryan's lack of safe and stable housing. According to Rosenberg, the parenting time notes reported positive interactions between Samuel and Bryan. And she said that Samuel always told her that he had enjoyed visiting his father.

Jessica M. testified that she is Samuel's cousin and foster parent. Samuel had been living with her since January 2023. Bryan had visits with Samuel 2 days each week (6 hours per week), and Jessica would be informed if a visit had been canceled. In the beginning, Samuel would be disappointed if a visit was canceled, but as time went on, "he was okay with it" and "would just go on with his day." There were no visits when Bryan was incarcerated, but visits resumed "about a month ago" and took place on Wednesday evenings; there had been no cancellations since visits resumed. According to Jessica, Samuel appeared to enjoy visits with Bryan.

Danielle Malley, a mental health therapist, began providing therapy services to Samuel in March 2023, and was still providing services to him at the time of the termination hearing. (The only time Malley did not provide services to Samuel was from the end of July to the beginning of October 2024, when she was on maternity leave.) Malley diagnosed Samuel with an "adjustment disorder, feelings of depression and anxiety." Initially, Samuel presented with anger and he struggled at school with friends and acted out. Malley used cognitive behavior therapy to help Samuel identify and process his emotions in healthy ways and to process potential trauma. Samuel's behavior improved with therapy and a stable home.

Malley also provided six family therapy sessions to Samuel and Bryan from March to June 25, 2024. The goal of the sessions was to help heal the relationship between Samuel and his father. Overall, the sessions went well, and Malley described the bond between Samuel and Bryan as "close." When the possibility of future reunification was discussed, Samuel expressed a desire to live with his father. Another provider provided a few family therapy sessions while Malley was on maternity leave. Malley did not resume the family therapy sessions after her maternity leave because Bryan was unavailable (he had been arrested), and there was no need for family therapy at that time. Malley confirmed that, in Samuel's ongoing individual sessions, he continued to state that he loved his father and wanted to be able to keep his father in his life. However, Samuel no

longer wanted to live with his father and wanted to stay where he currently lived because he was doing well there.

Case manager Rosenberg believed it would be beneficial for Samuel to have permanency. "Samuel needs a safe and stable caregiver who is able to provide him with a clean and safe living environment free of any substance use or abuse, as well as any domestic violence, and additionally, someone who will just ensure that all his basic needs are constantly being met, including his own emotional safety." Rosenberg did not believe that Bryan was able to provide those things to Samuel at the time of the termination hearing. Based on the length of time that Samuel had been in foster care and the progress made toward mitigating the safety threat that brought him into care, Rosenberg opined that it was in Samuel's best interests for Bryan's parental rights to be terminated.

Bryan asked the juvenile court to give him "a little bit more time" because he loved his son and wanted to be his father.

JUVENILE COURT'S DECISION

In its August 29, 2025, order terminating Bryan's parental rights to Samuel, the juvenile court found by clear and convincing evidence that statutory grounds existed pursuant to § 43-292(2), (6), and (7), and that termination of Bryan's parental rights was in the child's best interests.

Bryan appeals.

ASSIGNMENT OF ERROR

Bryan assigns that the juvenile court erred in finding that termination of his parental rights was in his child's best interests.

STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

ANALYSIS

Bryan contends that the juvenile court erred in finding that the termination of his parental rights was in his child's best interests. He does not challenge the court's finding of a statutory ground for termination of his parental rights to the child; however, for the sake of completeness, we briefly review that finding.

STATUTORY GROUNDS FOR TERMINATION

The State sought to terminate Bryan's parental rights to Samuel under § 43-292(2), (6), and (7). The juvenile court found, by clear and convincing evidence, that statutory grounds existed pursuant to all three grounds.

Section 43-292(7) allows for termination when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." The existence of the statutory basis alleged under § 43-292(7) should be determined as of the date the petition or motion

to terminate is filed. *In re Interest of Jessalina M.*, 315 Neb. 535, 997 N.W.2d 778 (2023). By the plain and ordinary meaning of the language in § 43-292(7), there are no exceptions to the condition of 15 out of 22 months' out-of-home placement. *In re Interest of Mateo L. et al., supra*. Section 43-292(7) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Mateo L. et al., supra*. In other words, if the 15-out-of-22 months' period is met, § 43-292(7) is met. See *In re Interest of Mateo L. et al., supra*.

Samuel was placed in the care and custody of DHHS on February 3, 2023, and he remained in relative foster care thereafter. By the time the operative motion to terminate Bryan's parental rights was filed on February 14, 2025, Samuel had been in an out-of-home placement for 24 months; thus, the 15-out-of-22 months' period was clearly satisfied.

We next consider whether termination is in Samuel's best interests.

BEST INTERESTS AND UNFITNESS

Under § 43-292, in addition to proving a statutory ground, the State must show that termination is in the best interests of the child. *In re Interest of Noah C.*, 306 Neb. 359, 945 N.W.2d 143 (2020). A child's best interests are presumed to be served by having a relationship with his or her parent. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). This presumption is overcome only when the State has proved that the parent is unfit. *Id.* Although the term "unfitness" is not expressly stated in § 43-292, the Nebraska Supreme Court has said that it derives from the fault and neglect subsections of that statute and from an assessment of the child's best interests. *In re Interest of Mateo L. et al., supra*. In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *In re Interest of Leyton C. & Landyn C., supra*. The best interests analysis and the parental fitness analysis are separate inquiries, but each examines essentially the same underlying facts as the other. *Id.* We have previously set forth the evidence presented at the termination hearing, and we will not recount it again here.

Notably, Bryan was unsuccessfully discharged from three different drug testing agencies. He was unsuccessfully discharged from three different family support agencies for lack of participation. And his mental health therapist discharged him from services because there had been a lot of "no shows" and a lack of communication. According to Bryan's therapist, his therapy goals were ongoing, and there was still a need to address the goals that had been established.

Bryan tested positive for methamphetamines in December 2024. In January 2025, he was arrested for possession of controlled substances, and he later pled no contest to one charged count. Although he subsequently entered treatment and had apparently been testing negative for substances while in treatment, this was more than 2 years after Samuel's removal and placement in DHHS' custody and foster care. Bryan had yet to obtain and maintain safe and stable housing and a legal source of income.

There is evidence that Samuel enjoyed his visits with Bryan and that they appeared to have a close bond. But having a bond with a child does not make a parent a fit person to provide parental care for him or her. See *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016). By the

time of the termination hearing, Samuel had been in an out-of-home placement for 27 months. Case manager Rosenberg believed it would be beneficial for Samuel to have permanency, and she opined that it was in Samuel's best interests for Bryan's parental rights to be terminated. We agree. "Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." *In re Interest of Walter W.*, 274 Neb. 859, 872, 744 N.W.2d 55, 65 (2008). And when a parent is unable or unwilling to rehabilitate himself or herself within a reasonable period of time, the child's best interests require termination of parental rights. *In re Interest of Leyton C. & Landyn C., supra*. The State proved that Bryan was unfit, meaning that he has a personal deficiency or incapacity which has prevented, or will prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to the child's well-being. See *id.* We further find that there is clear and convincing evidence that it is in Samuel's best interests to terminate Bryan's parental rights.

## CONCLUSION

For the foregoing reasons, we affirm the order of the juvenile court terminating Bryan's parental rights to Samuel.

AFFIRMED.